Filed 10/13/23  In re S.I. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In the Matter of S.I. et al., Persons Coming Under the Juvenile Court Law. | B323539 <br><br> (Los Angeles County Super. Ct. No. 20CCJP01832) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CYNTHIA A., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Commissioner.  Affirmed.

Lori Seigel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

_____

Cynthia A. (mother) appeals from juvenile court orders from a six-month status review hearing under Welfare and Institutions Code section 366.21, subdivision (c), denying her request to have her child, K.W. (born November 2010), returned to her care.[1]  Mother challenges both this order and the court's findings under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) regarding K.W. and mother's other child, S.I. (born December 2007).

We find no error in the juvenile court's status review orders.  However, we conditionally affirm those orders and remand the matter with directions for the juvenile court and the Los Angeles Department of Children and Family Services (DCFS) to comply with their ongoing duty of inquiry under ICWA.

### FACTUAL AND PROCEDURAL BACKGROUND
**A.     The Removal and Dependency Petition**

DCFS received a referral on behalf of S.I. and K.W. in September 2021 after S.I. reported suicidal ideation at school.  When interviewed, S.I. reported that mother had told her, "I hope you die.  Go ahead and tell them at school.  I don't want you

---

[1]     Unspecified references are to the Welfare and Institutions Code.

2

anymore."[2]  S.I. also reported that mother had punched and choked her in February 2021, "beat the hell out of her" on prior occasions, called her names, and made fun of her hygiene.  When interviewed, K.W. reported that mother traveled out of state and left K.W. and her siblings D.A. and S.I. in the care of an adult sibling.  D.A. and the adult caregiver got into a physical altercation requiring police intervention.  K.W. also reported that mother had not taken her to a doctor "in a long time" despite the child having untreated bedwetting.

Mother accused S.I. of lying and ordered the children to tell a social worker they had never reported any issues.  Mother also accused the interviewing social worker of racism and lying and the school of "triggering" her children.

S.I. and K.W. were removed from mother and placed in a foster home.  Given her mental health issues, D.A. was placed in transitional shelter care.

On September 22, 2021, DCFS filed the operative petition under section 300 on behalf of D.A., S.I., and K.W. based on allegations of mother's emotional and physical abuse of D.A. and S.I., mother's failure to obtain appropriate mental health and medical treatment for the children, and her failure to appropriately plan for the children's care and supervision.  On

---

[2]     S.I. and K.W. are half siblings.  The alleged fathers of S.I. and K.W. are not parties to this appeal.

Mother has 11 children and an extensive dependency history.  Around 2020, DCFS substantiated allegations of mother's physical abuse against the children's older sibling, D.A., and the case terminated after a period of family reunification and maintenance services.  In 2007, an investigation revealed mother had physically abused another older sibling, S.A.  In 1995, S.A. and three other siblings were detained pending an investigation into child abuse and neglect.

September 27, 2021, the court detained the children and ordered mother monitored visitation.

## B.     Jurisdiction and Disposition

Following a medical examination in October 2021, DCFS reported that K.W. had a two-year history of nocturnal enuresis (bedwetting) stemming from a fast-food diet and/or witnessing severe traumatic events.  K.W. exhibited symptoms consistent with post-traumatic stress disorder including self-destructive behavior, trouble sleeping and concentrating, angry outbursts, overwhelming shame, and hallucinations.  The examining physician recommended wraparound psychiatric therapy.

During a child and family team meeting in November 2021, mother cornered S.I. in a restroom, threatening the child that "she better tell the Court what she wants her to say or she will see what happens to her when she comes home."  S.I. refused further visitation with mother.  The same month, K.W. was placed in a new foster home, the child's third placement in two months.  It had been reported that K.W. previously ran away from her foster home after having an unmonitored phone call with mother.  According to the report, mother and an adult daughter picked up K.W. and drove to a police station to report abuse by K.W.'s foster mother.  A month later, mother posted a video to her Facebook account accusing the children's foster parents of abuse and DCFS of spreading lies.  In the video, mother admitted she had encouraged K.W. to run away from her placement.  The juvenile court suspended mother's visitation on December 13, 2021.

In February 2022, the juvenile court sustained an amended petition, exercising jurisdiction over S.I. and K.W. under

4

section 300, subdivisions (a), (b), (c), and (j), based on mother's physical abuse of S.I., medical neglect of D.A. and S.I., emotional abuse of D.A. and S.I., and mother's failure to appropriately plan for the children's care. The court ordered DCFS to initiate placement of S.I. and K.W. under the interstate compact on the placement of children (ICPC) with two adult siblings. The court removed both children from mother's custody, suitably placed them in the care of DCFS, and ordered mother monitored visitation and reunification services.[3]

## C.    Status Review Hearing

As of March 2022, DCFS was searching for another placement for K.W. due to mother's continued harassment of the child's caregiver. At a progress hearing on March 29, 2022, K.W.'s counsel indicated the child wished to live out-of-state with her adult siblings. The court ordered further efforts at the ICPCs and admonished mother that her "outlandish behavior" with DCFS and the children's caregivers was contrary to the children's best interests.

In June 2022, DCFS reported that K.W. was seen leaving her school campus by herself. K.W. admitted she left school to go to mother's home to retrieve belongings while mother was out of the home. Later that month, the court held a hearing on the pending ICPCs. During the hearing, mother requested to represent herself and accused the court, counsel, and DCFS of spreading false information.

---

[3]    The reunification services included an anger management program; parenting program for teens with mental health needs; individual counseling to address case issues, mental health needs of mother and the children; and a National Alliance on Mental Illness (NAMI) program.

In status review reports, DCFS reported on mother's partial compliance with her reunification services. Mother had completed parenting and anger management programs and attended 13 individual counseling sessions that did not address case issues. Mother continued to report she did not need individual counseling, and she made untruthful statements about signing up for NAMI group meetings and attempted to coach K.W. to recant statements about returning to mother's care.

Between February and June 2022, mother consistently visited with K.W. Though mother was frequently late, the visits were positive and appropriate. K.W. stated that she loved her mother and would like to live with her again if reunified. K.W. followed instructions at school and had no disciplinary issues. In June 2022, the children were placed in S.A.'s home in Missouri. Two months later, S.I. was placed on a psychiatric hold for expressing thoughts of killing herself and S.A. Fearing for her safety, S.A. asked that both children be placed back in the care of DCFS.

As of September 2022, K.W. was placed with a prior caregiver while S.I. was placed in a transitional shelter. On August 30, 2022, mother called the police to request a well-child check at S.I.'s transitional shelter. S.I. did not wish to speak with mother.

During a conversation with a social worker, mother's therapist stated she was not equipped to provide mother with appropriate support. The therapist noted that mother was "very adamant about what information" would be provided in a progress letter and wanted to review it before the therapist's submission to DCFS. In the progress letter, the therapist stated that mother's goals were to improve communication, listening,

6

and problem-solving skills.  Mother believed those skills would improve parenting.  When a social worker called mother to discuss finding a new therapist, she spoke over the social worker "and continued to make threats towards the therapist, . . . claiming that she did not write a good enough letter and that she would get her fired from her job."  As of September 1, 2022, mother attended two NAMI group meetings.

During a phone conversation to discuss a new visitation schedule with K.W. on September 6, 2022, mother consistently interrupted a social worker and accused DCFS of lying.  Mother also denied she had discussed case issues with the children and coached K.W. to say what mother wanted.  DCFS believed mother's behaviors did not reflect significant progress with case issues.  DCFS recommended continued family reunification services.

Based on the children's discharge from ICPC, the juvenile court continued the six-month status review hearing.  In addition, the court ordered DCFS to refer mother to another therapist for case-specific issues and a NAMI support group.

At the continued status review hearing on September 8, 2022, counsel for K.W. argued the child would be at substantial risk if returned to mother's custody.  Counsel requested six months of continued reunification services.  Mother summarized progress she had made in her case plan, informed the court of her recent employment, and requested the return of S.I. and K.W. to her care, or alternatively, unmonitored in-home visits.  Mother stated that K.W. had "never been harmed" in her care and did not have "any concerns."  The court commended mother on her progress in services but noted ongoing concern with her individual counseling.  The court found that while mother was

7

"not at substantial compliance yet, [ ] she [was] working on substantial compliance" through continued NAMI meetings and individual counseling.  Finding by a preponderance of evidence that return of S.I. and K.W. would be detrimental to their physical and emotional wellbeing, the court ordered further reunification services and visitation.  Mother appealed.

## DISCUSSION

### A.   Substantial Evidence Supports the Finding of Detriment

Mother challenges the sufficiency of evidence supporting the juvenile court's finding that returning K.W. to her custody posed a risk of detriment to the child.  Mother does not challenge the same finding as to S.I.

At the six-month review hearing, the juvenile court must return the child to parental custody "unless the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd (e)(1).)  When making its findings, the juvenile court must "specify the factual basis for its conclusion that the return would be detrimental or would not be detrimental." (§ 366.21, subd. (e)(2).)

Whether placement of a child with their parent would be detrimental is to be examined by looking at the totality of the circumstances.  (See *A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1059 ["Detriment can be shown many different ways"].)  The failure of the parent "to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental."

8

(§ 366.21, subd. (e)(1); see *In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483 (*Mary B.*).)  Other circumstances may bear on a finding of detriment, including:  (1) the "effect . . . return [to parental custody] would have on the child" (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 894); (2) "the manner in which the parent has conducted himself or herself in relation to [the] minor in the past" (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705); (3) instability in housing and employment (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212); and (4) the parent's "efforts and *progress* . . . towards remedying the causes requiring out-of-home care as well as their cooperation in availing themselves of the services provided."  (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141–1142.)

We review the juvenile court's finding of detriment for substantial evidence, asking only whether the finding is supported by evidence that is "'reasonable, credible[,] and of solid value . . . .' [Citation.]"  (*In re E.D.* (2013) 217 Cal.App.4th 960, 966.)  We construe the record in the light most favorable to the court's finding and do not consider whether there is evidence from which the court could have drawn a different conclusion.  (*In re A.C.* (2020) 54 Cal.App.5th 38, 43 (*A.C.*); *In re M.R.* (2017) 8 Cal.App.5th 101, 108 (*M.R.*).)

Here, substantial evidence supports the juvenile court's finding that returning K.W. to mother's custody would create a substantial risk of detriment to the child's safety, protection, or well-being.  It is undisputed mother was not in substantial compliance with her case plan.  At the time of the status review hearing, mother had completed parenting and anger management programs, was enrolled in individual counseling, and attended several NAMI group meetings.  Despite this

9

progress, mother had not addressed case issues with her therapist and she exhibited controlling behavior over her therapist, her children, her children's caregivers, and DCFS.

In addition, mother continued to deny or minimize her responsibility for the acts resulting in K.W.'s removal from her custody. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"]; *In re Andrea G.* (1990) 221 Cal.App.3d 547, 553 ["successful treatment cannot occur until [the parent] accepts responsibility for her actions"].) Mother's denial was both direct and continuing. During the status review hearing, mother averred K.W. had no "concerns" and had "never been harmed" while in her care. Mother's limited awareness of K.W.'s needs and mother's emotional coercion over the child is the type of behavior necessitating dependency jurisdiction in the first place.

Mother resists our conclusion with various arguments, none of which we find persuasive.

First, mother highlights her progress in her case plan and the skills she learned in parenting. This argument essentially reweighs the evidence in mother's favor contrary to the standards of our review. (See *A.C.*, *supra*, 54 Cal.App.5th at p. 43; *M.R.*, *supra*, 8 Cal.App.5th at p. 108.)

Second, mother contends the trial court failed to specify a factual basis for how her unsubstantial compliance placed K.W. at risk of detriment. (See § 366.21, subd. (e)(2) ["the court shall specify the factual basis for its conclusion that the return would be detrimental"].) Mother misconstrues the record. The juvenile court did specify a factual basis for its conclusion. The court stated that mother's unsubstantial compliance with her case plan, specifically her need to finish NAMI meetings and

10

individual counseling on case-specific issues, placed K.W. at substantial risk of detriment.  To the extent mother complains the juvenile court should have articulated a more detailed finding, her failure to object below or request the information she now seeks constitutes a forfeiture on appeal.  (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293; *In re S.C.* (2006) 138 Cal.App.4th 396, 406.)

Third, mother contends she was entitled to the presumption favoring the return of K.W. at the status review hearing.  (Citing §§ 366.21, 366.22.)  We agree sections 366.21 and 366.22 provide presumptions favoring "the return of the child to the physical custody of their parent."  But those presumptions are conditional—they apply "*unless* the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§§ 366.21, subd. (e)(1), italics added, 366.22, subd. (a)(1).)  As discussed, the court's detriment finding means that mother was not entitled to the presumptions on which she relies.

Finally, mother contends the juvenile court should have considered a family maintenance plan as a reasonable alternative to continued removal.  Mother's argument ignores the posture of her case.  The "reasonable means" inquiry to which mother refers occurs at the dispositional phase of the case (see § 361, subd. (c)), when the court decides whether to remove the child from parental custody; it does not occur post-removal at a review hearing.  Mother's reliance on *In re Henry V.* (2004) 119 Cal.App.4th 522, makes this distinction clear.  (See *id.* at pp. 530–531 [disposition order "removing a child from a parent's custody is 'a critical firebreak in California's juvenile dependency

11

system'" in which courts "must recognize the legal restraints against separating parent and child"].)  The juvenile court did not err when making its finding of detriment over K.W.[4]

## B.    ICWA Compliance

Mother contends that DCFS and the juvenile court failed to inquire of extended family members as to whether S.I. and K.W. are or may be Indian children under ICWA.  We agree.

Under state law, the juvenile court and DCFS have "an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child."[5]  (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9, 11–12.)  "The continuing duty to inquire whether a child is or may be an Indian child 'can be divided into three phases:  the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice.'"  (*In re Y.W.* (2021) 70 Cal.App.5th 542, 552.)  The duty of initial inquiry includes, but is not limited to, "asking the child, parents, legal

---

[4]    For the very same reasons, we find no abuse of the juvenile court's discretion denying mother's request for liberalized visitation with K.W.  (See *In re Natasha A.* (1996) 42 Cal.App.4th 28, 34–35; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067 ["evaluating the factual basis for an exercise of discretion [in custody and visitation orders] is similar to analyzing the sufficiency of the evidence for the ruling"].)

[5]    An "Indian child" is a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.  (§ 224.1, subds. (a), (b); 25 U.S.C. § 1903(4).)

12

guardian, Indian custodian, extended family members,[6] others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subds. (a), (b).)

Here, DCFS does not dispute mother's contention that it failed to fully discharge its duty of initial inquiry, nor does it argue that its failure was non-prejudicial. Instead, DCFS disagrees with mother on the appropriate remedy for its failure to comply.

We conclude that because the juvenile court retains jurisdiction over S.I. and K.W. and continues to have an ongoing duty to ensure ICWA compliance, the failure by DCFS to adequately discharge its duty of initial inquiry can be addressed by a conditional affirmance of the status review orders with directions to the juvenile court to require that DCFS fulfill its duty. (E.g., *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 639, fn. 2 ["We see no need to order any ICWA findings vacated because ICWA-related obligations are continuing duties; that means earlier ICWA-related findings are subject to change and no order vacating an earlier finding is necessary here"]; *In re A.C.* (2022) 75 Cal.App.5th 1009, 1018 [same].) The parties identify several extended family members who, despite having contact with DCFS, have not been asked about possible Indian heritage. On remand, DCFS shall attempt to inquire of these known family members (including maternal grandmother, C.C., and adult

---

[6]     "Extended family members" include persons defined by law or custom of the Indian child's tribe, or in the absence of law or custom, adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (§ 224.1, subd. (c); 25 U.S.C. § 1903(2).)

13

siblings, S.A. and Mariah A.), as well as any other extended family member known to DCFS.

## DISPOSITION

The six-month status review orders are conditionally affirmed. The matter is remanded with instructions to the juvenile court to conduct any necessary ICWA inquiry as to available relatives as soon as practicable. If that inquiry reveals evidence of Native American heritage, DCFS and the court shall comply with additional ICWA requirements, including, if applicable, the notice requirements of section 224.3. If it does not, the orders shall stand.


MORI, J.

We concur:



CURREY, P. J.



ZUKIN, J.



14